THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD MEHLBERG, Defendant-Appellant.

Fifth District   No. 5—90—0658

Opinion filed August 3, 1993.

Daniel M. Kirwan and Michelle A. Zalisko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Kathryn Dobrinic, State's Attorney, of Hillsboro (Norbert J. Goetten, Stephen E. Norris, and Rebecca Sanders, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WELCH[1] delivered the opinion of the court:

Defendant, Donald Mehlberg, was convicted on August 31, 1990, of aggravated criminal sexual assault and was sentenced on October 5, 1990, by the circuit court of Montgomery County to 30 years in the Department of Corrections. Defendant raises the following issues for review:

(1) whether the trial court erred in admitting evidence that DNA found in semen in the victim's panties matched the DNA found in a sample of defendant's blood;

(2) whether defendant was deprived of his constitutional right to effective assistance of counsel when counsel elicited, during cross-examination of the State's expert witnesses, statistical evidence of the probability of a match occurring between the DNA found in the victim's panties and the DNA found in the blood sample taken from defendant;

(3) whether defendant was deprived of his constitutional right to effective assistance of counsel because counsel failed to

---

[1]Justice Welch was assigned to the panel after the retirement of Justice H. Lewis.

call defense expert witnesses to challenge the reliability of DNA identification and the statistical probability of another individual having defendant's DNA pattern;

(4) whether the error in admitting the DNA identification evidence could be considered harmless where the State could not have proved defendant guilty of aggravated criminal sexual assault beyond a reasonable doubt without said evidence; and

(5) whether defendant was denied a fair trial by the trial court's denial of defendant's motion for a mistrial made after one of the prospective jurors announced to the *voir dire* panel that she was familiar with defendant through his files in the probation office, giving the inference to the panel that defendant had a prior record.

We affirm the judgment of defendant's conviction and sentence.

The evidence adduced at trial indicates that the victim and her husband were neighbors of defendant's parents in Litchfield, Illinois, since December 1988. Defendant was living with his parents at the time of the alleged assault in July 1989. The victim knew defendant from high school but had not spoken with him in nine years. The victim had seen her husband speaking with defendant outside of the home prior to the alleged July 16, 1989, incident, but defendant had never been invited into the victim's home.

The victim's husband is employed in St. Louis, Missouri, and in July 1989 was working either the 6 a.m. to 6 p.m. shift or the 6 p.m. to 6 a.m. shift, five to six days per week. She and her husband own two vehicles, a Camaro and a truck, and she drives the Camaro most of the time.

Photographs of the victim's house were admitted into evidence. These photographs showed the proximity of the victim's house to the house owned by defendant's parents and showed that the entire backyard of the victim's house is fenced. A diagram of the victim's house was also admitted into evidence. The victim testified that there is a front door on the house and a kitchen door at the landing leading right to the basement and left into the garage. The kitchen door has a hook-type lock on it which must be locked from the inside. There is another door leading from the landing to the garage which has a deadbolt-type lock; however, a hole had been drilled into the door so that a person could stick his finger in and unlock the deadbolt lock. There is also a door in the back of the garage which leads into the fenced back yard. The victim's car is usually parked on the right-hand side of the garage and the garage-door handle locks by turning the knob.

The victim testified that she had been home during the evening of July 15, 1989, but had left home around 11:15 p.m. to retrieve her daughter Amber from a cookout at a friend's house. She exited the house by the front door and remembered locking that door when she left. The victim testified, however, that the kitchen door to the landing was not locked, nor was the landing door leading to the garage or the door leading from the garage into the back yard. She recalled that the garage door was down but did not think that it was locked. The victim saw the defendant, in the front of her house, walking across the sidewalk towards his parents' home, and she waved at him as she walked to the driveway to get into her car.

The victim's husband was also at the cookout that evening but did not leave when the victim came to pick up Amber. The victim and her daughter arrived home around midnight. They went into the living room, and the victim put a movie into the VCR for Amber to watch before she fell asleep. The victim then locked the front door and the kitchen door to the landing. The victim went to the bedroom to take off her shorts, grabbed a blanket, and went to the bathroom. She then lay down on the couch in the living room to watch some more television but set the VCR to turn off at 3 a.m. in case she fell asleep. The victim was wearing a white T-shirt, underwear, and socks. There was a panty liner in her underwear because she was just finishing her period.

The victim fell asleep on the couch with the television on but was awakened when someone placed a hand across her mouth and a knife at her throat. She heard a voice say, "Don't scream or anything or it will be your little girl's ass." She could not see who the perpetrator was because he was behind her with the knife on her throat. The night light between the two chairs was the only light on in the living room. Out of the corner of her eye the victim could see that the perpetrator was wearing a white mask.

The perpetrator told the victim to get off the couch and go through the kitchen. He unlocked the kitchen door and pushed her into the garage. There were no lights on in the kitchen, the landing area, or the garage. The perpetrator told the victim to take off her underwear, made her bend over, and had intercourse with her from behind. The perpetrator told her that it was not working and bent her head down so that she would have oral sex with him. She pleaded with the perpetrator not to make her do this act. The perpetrator told the victim to turn back around and started having intercourse with her again.

The perpetrator told her not to call the police because he would call her husband's employer and tell them that the victim's husband had been convicted of a felony about six years ago. He asked her if her husband would lose his job if his employer knew this, and she said yes. The perpetrator used her husband's first name when he made this statement. Defendant and the State stipulated that, at a time approximately six years prior to the alleged aggravated criminal sexual assault in this case, defendant and the victim's husband resided together for a period of months in the same residential facility.

The perpetrator also told her that he had been in her house before and that he knew when her husband left for work and when he came home. The perpetrator told her that her husband had hired him to watch her while he was at work. He said that he knew she had left Amber by herself when she left the house earlier that evening.

When she heard the garage door go up and down the victim grabbed her underwear and ran into the house. She called her sister and attempted to locate her husband. The victim's sister drove her to the hospital. The victim admitted on cross-examination that her husband occasionally brought some of his friends to the house to socialize, but defendant was not one of those friends.

Vonna Wessell testified that she is a registered nurse employed by St. Francis Hospital in Litchfield, Illinois. Nurse Wessell was on duty at 3:45 a.m. on July 16, 1989, when the victim arrived at the emergency room stating that she had been sexually assaulted. St. Francis Hospital follows a certain procedure with sexual assault victims: they first make certain that the police have been called, they explain the evidence-kit procedure to the patient, then they take the clothing worn by the victim and obtain samples from the patient. These samples include vaginal and rectal swabs and smears, saliva samples, fingernail scrapings, head- and pubic-hair samples, and combings.

Nurse Wessell took a T-shirt, a pair of socks, and a pair of panties from the victim. She noticed that there was a sanitary napkin or panty liner inside of the white cotton panties. Each item was placed in a separate paper bag and sealed. Nurse Wessell identified the paper sacks containing the T-shirt, socks, and panties taken from the victim on July 16, 1989. The sealed paper sacks containing the clothing evidence were turned over to Officer Wilson with the Litchfield police department. Nurse Wessell was present when the doctor examined the victim and took the vaginal and rectal samples and smears. She identified the sexual-assault evidence kit containing the blood samples and the rectal, vaginal, and oral smears and swabs and the head-hair

and pubic-hair standards and combings taken from the victim on July 16, 1989.

Nurse Wessell admitted on cross-examination that none of the victim's clothing was torn or in disarray when she appeared at the emergency room. She also admitted that during the examination of the victim she did not notice any indication of apparent trauma to any area of the victim's body.

Ross Wilson testified that he is a police officer with the City of Litchfield and that he was on duty during the early morning hours of July 16, 1989. He was called by St. Francis Hospital at 3:47 a.m. on that date to investigate a possible sexual assault. He left the hospital for a period of time to investigate the residence where the offense supposedly occurred but returned to the hospital at approximately 7 a.m. Officer Wilson took possession of three sealed paper bags and a rape kit from Nurse Vonna Wessell and identified these items in court. Officer Wilson turned the three bags and rape kit over to Chief William Dolahite at approximately 8 a.m. At no time did Officer Wilson open the three bags or the rape kit.

William Dolahite testified that he is chief of police for the City of Litchfield. Chief Dolahite testified that he received possession of a sealed cardboard box and three paper sacks from Officer Ron Wilson at his home on July 16, 1989, and he identified those items in court. Chief Dolahite took them to the police department around 9 a.m. and locked them in the refrigerator in the evidence room. On July 20, 1989, Chief Dolahite delivered these items, unopened, to William Frank in Springfield, Illinois, on July 20, 1989. Chief Dolahite also took possession of a sealed white envelope on August 24, 1989, from Sheriff Jim Vazzi, and he immediately took the envelope to William Frank at the lab in Springfield. The envelope was prepared by a lab technician at the Hillsboro Hospital. He identified the envelope as People's group exhibit 17.

Jim Vazzi testified that he is the Montgomery County sheriff. He received possession of a large white envelope from Jim Schnarre, a lab technician at the Hillsboro Hospital, at approximately 10:30 a.m. on August 24, 1989, and identified the envelope as People's group exhibit 17. Sheriff Vazzi delivered the envelope to Chief Dolahite approximately 15 minutes later. The envelope indicates that it contains specimens of pubic hair and head hair and three blood tubes taken from defendant.

James Schnarre testified that he is a registered medical technologist and is the director of the Hillsboro Hospital laboratory. He took blood, saliva, pubic-hair and head-hair samples from defendant at ap-

proximately 10 a.m. on August 24, 1989, at the hospital. Mr. Schnarre identified People's group exhibit 17 and identified the samples contained therein. Mr. Schnarre also identified defendant in court as the person from whom he took these samples. Mr. Schnarre testified that he removed another set of samples from the defendant on a later date and identified People's group exhibit 18 as the envelope containing specimens collected from defendant on September 15, 1989. He turned this envelope over to a police officer approximately 15 minutes later.

William Frank testified that he is a forensic scientist and that he is presently the DNA research coordinator with the Illinois State Police, Bureau of Forensic Sciences, at the Springfield Forensic Science Laboratory. As a forensic serologist Mr. Frank receives and analyzes evidence, prepares a report of his findings regarding such evidence, and testifies regarding his findings in court. He completed a 2½-year training program with the Illinois State Police in the analysis of blood, bloodstains, and body-fluid stains and analysis of hairs and fibers. He has also received forensic serology training, other than from the Illinois State Police, in Minnesota, California, South Carolina, Florida, and Indiana and at the Federal Bureau of Investigation (FBI) Academy in Quantico, Virginia. He has testified on 20 occasions in the State of Illinois as a forensic serology expert, has conducted training courses in this area of expertise, and has published journals or articles in this specific area. Counsel for defendant conducted no cross-examination on the foundation of Mr. Frank as an expert in the science of serology, and the court so recognized William Frank as an expert in this field.

Mr. Frank testified that the typical examination is performed for the identification of either bloodstains or body-fluid stains on items of physical evidence. Body-fluid stains can include saliva, semen, or vaginal secretions. Mr. Frank explained that semen is composed of a liquid portion and a cellular portion and that the liquid portion contains organic components and certain proteins. Seminal stains can be identified by the presence in the evidence of one of the proteins present in the liquid fraction of the seminal fluid or the identification of spermatozoa present in the stain. Mr. Frank stated that if a semen stain is stored in a moist or humid environment bacteria can grow which will break down the spermatozoa but leave the protein in the stain intact. In that event semen can be identified, even in the absence of observing any spermatozoa, by the presence of the proteins. Mr. Frank noted that spermatozoa can last much longer in a cool dry environment. Mr. Frank also testified that from looking at the number of

spermatazoa in a vaginal swabbing he can determine when that particular sample was taken from a victim.

Mr. Frank testified that blood is also composed of a liquid portion, called plasma, and a cellular portion. He can identify a bloodstain by reacting a sample with chemicals and antiserum. Blood is typed by identifying the ABO-blood-group substance on the cells in the blood and by identifying the antibodies that are present in the liquid portion of the blood. The ABO-blood-group system is an example of a genetic marker, a substance that is present in everyone but in different forms.

Mr. Frank also testified that 75% of the population are "secretors," or someone who secretes the ABO-blood-group type in his body-fluid secretions. If a male individual is a secretor, it is possible to detect that man's blood factor in seminal stains he produced. This can be accomplished using a sample of seminal stain as small as a quarter of an inch in size. It is also possible to distinguish between stains which are a mixture of secretions from two or more people.

Another example of a genetic marker is phosphoglucomutase, or PGM, which is an enzyme present in blood, semen, vaginal secretions, or other body fluids. Like the ABO blood type, PGM is found in everyone, but in different forms. The PGM test is run by a method called electrophoresis, where charged particles of PGM are moved through a gelatin-like substance to create a banding pattern from which you can determine the person's PGM type.

Mr. Frank stated that the sexual-assault procedure which he follows is to generally examine the items of evidence for the presence of semen. He will search for possible semen stains and preliminarily perform a reaction test on the stain to see if it could contain semen. If that test is positive, he will look for the presence of spermatozoa or the presence of the seminal specific proteins.

Mr. Frank was involved in the investigation of the alleged sexual assault on the victim in the instant case. He identified People's group exhibit 13 as one of the brown paper bags he received from William Dolahite of the Litchfield police. Mr. Frank testified that the T-shirt which was located in the brown paper bag tested negative for the presence of seminal material. He also collected hair and fibrous debris from the shirt which he placed in a plastic packet. The shirt and the plastic packet containing debris were resealed in the brown bag with evidence tape. Mr. Frank also identified People's group exhibit 14 as another paper sack received from Chief Dolahite in this case; this sack contained a pair of socks. He similarly found no seminal material

on the socks but collected debris therefrom, which was resealed with the socks in the bag.

Mr. Frank identified People's group exhibit 15A-1 as another paper sack received from Chief Dolahite; this sack contained the victim's underwear. Preliminary testing of the panties and panty liner showed the presence of seminal material by the identification of spermatozoa. Mr. Frank made marks on this item of evidence to show five questioned stained areas and unstained areas. He then cut portions of the stained areas on the panty liner and the panties and placed them in small plastic vials. He also placed unstained-portion samples into separate paper packets, and both the plastic vials and paper packets were then placed in liquid-nitrogen storage in order to preserve the genetic markers present on the evidence at that point in time. Mr. Frank stated that all evidence had been locked in his own individual laboratory storage vault to which no one else had access. Mr. Frank later tested the samples for the presence of the ABO and PGM genetic markers.

Mr. Frank also received a sexual-assault evidence-collection kit from Chief Dolahite on July 20, 1989. He performed genetic-marking tests on the blood located in the two tubes in the kit. He determined that the victim was type A of the ABO-blood-type system with type H activity, that she is an ABO group A secretor, and that she is a PGM type one minus. Mr. Frank also tested swabbings taken from the victim's mouth, vagina, and rectum for the presence of seminal material. He obtained a positive reaction for seminal material on the vaginal swabbing and a positive, but weaker, reaction on the rectal swabbing. The cotton material was cut off the swabs and placed into liquid-nitrogen storage.

Mr. Frank testified that he received a blood sample from the defendant for testing on August 24, 1989. He was able to determine that defendant was also a type A with H activity in the ABO-blood-type system and an ABO group A secretor. Defendant also has the same PGM type as the victim.

Mr. Frank tested the stains from the panty liner and panty crotch and vaginal swabs for presence of genetic markers. He found ABO group A with H activity present in the seminal-material stains but found inconclusive activity for the PGM genetic marker. Based on this testing, Mr. Frank opined that defendant's seminal fluid could have made the stain on the undergarment and on the vaginal swab. The seminal-material stain could not have come from the victim because she is a female. He also stated that the high number of intact sper-

matozoa present on the vaginal swab led him to conclude that it was a recent deposition of seminal material.

Mr. Frank conceded on cross-examination, however, that the sample tested on the vaginal swab could have been contaminated with body fluids from the victim. He also admitted that the PGM testing was inconclusive because in some of the samples there was no PGM present and in others there was no readable activity. He accounted for this result by stating that the sample could have been degraded; unlike the ABO blood group which lasts forever, PGM degrades much more rapidly. Mr. Frank also admitted that 30% of the population are ABO group A blood type, A secretors, and that he did not analyze the blood type for the victim's husband.

Mr. Frank identified People's group exhibit 16J as a cardboard microscope slide holder containing slides produced from stain extracts from the vaginal swabs. After examining the slides, Mr. Frank sealed the cardboard box and placed it in the rape evidence kit. Mr. Frank identified People's group exhibit 18F as a wooden slide box containing slides on which the collected hair samples were mounted. All exhibits were in Frank's sole possession at the Illinois State Police Laboratory and sealed after they were used. Mr. Frank admitted on cross-examination that none of the hairs collected off the T-shirt or retrieved from the panties or panty liner could have originated from the defendant, based on comparison with samples taken from defendant.

Mr. Frank testified that there is another way to scientifically narrow down the group of people who might have contributed the seminal material found on the victim's panties and that was by forensic application of DNA-typing methodology. DNA stands for deoxyribonucleic acid and is the genetic material found in all cells of the body containing a nucleus. The Illinois State crime lab does not at this time perform DNA testing, but this testing is available at the FBI laboratory in Washington, D.C., and at two private laboratories, Cellmark Laboratories and Lifecodes Laboratories.

On September 18, 1989, Mr. Frank prepared standards of the blood types of the victim and of the defendant from the blood samples he received at the State laboratory. He did this by placing a few drops of the blood sample on some sterile cotton cloth to dry. The cotton cloth was then placed into a separate envelope, sealed, and placed in the sexual-assault evidence-collection kit which was picked up by Officer Richard Elledge of the Litchfield police department along with exhibits 13, 14, and 15A, the paper sacks containing evidence in this case. He instructed Officer Elledge to mail the dried blood standards from the victim and the defendant, the samples of questioned stained

areas from the panties, and the vaginal swabs to the FBI laboratory in Washington, D.C.

Officer Elledge testified that during his investigation of the alleged sexual assault of the victim he picked up the paper bag marked People's exhibit 15A-1 from the Springfield forensic lab on September 22, 1989. The bag which contained the victim's panties was stapled shut and sealed with blue evidence tape. He placed the bag along with the rest of the evidence for the case in his personal locker to which only he and Chief Dolahite had access. The bag remained in his locker until March 19, 1990, when it was turned over to counsel for defendant. Officer Elledge admitted on cross-examination that the bag was not refrigerated in his locker, but he stated that the room was air-conditioned.

Defendant stipulated that People's exhibit 15A-1 was transferred by defense counsel to Dr. Robin Cotton at Cellmark Diagnostics Laboratories on March 21, 1990, by way of Federal Express. Defendant further stipulated that on April 16, 1990, one red-topped tube of blood and one purple-topped tube of blood, drawn on that date from the victim, and one red-topped tube of blood and one purple-topped tube of blood, drawn from defendant, were transferred to defense counsel by lab technician Jim Schnarre. Finally, defendant stipulated that on May 8, 1990, a sealed cardboard box was received by Julie Ann Light of Cellmark Diagnostics Laboratories, the box contained the four above-described blood samples of victim and the defendant, and the samples were in the same tubes, seals unbroken, in which they had been placed at the time of their drawing by lab technician Schnarre.

Robin Cotton, Ph.D., testified that she is employed by Cellmark Diagnostics in Germantown, Maryland. Cellmark uses the technology of DNA typing to determine questions of paternity or identification. Dr. Cotton is the research and development manager for Cellmark, and her responsibilities include research, review, and approval of work relating to the DNA-typing process and serving as a witness in court. Dr. Cotton holds bachelor of science and master of science degrees in biology and a doctor of philosophy degree in molecular biology and biochemistry. Dr. Cotton has coauthored several articles, two involving paternity and two related specifically to using DNA for identification. She is a member of the American Society of Cell Biology, the American Society of Human Genetics, and the American Academy of Forensic Science. She has qualified to testify approximately 30 times in about 15 different States as an expert witness in the use of DNA in identification testing. Counsel for defendant conducted no cross-examination on the foundation of Dr. Cotton as an ex-

pert in the field of DNA in identification testing, and the court so recognized Dr. Cotton as an expert in this field.

Dr. Cotton testified that DNA is that component of cells which carries all the genetic information. This information is passed on from parent to child and determines what the individual will look like, how the individual will function as a biological organism, and how the individual will develop throughout his or her life. Everyone, other than identical twins, will have different DNA.

DNA is found in the nucleus of the cell and will be the same no matter where in the body the cell is located. In each cell there are 46 chromosomes. The chromosomes come in 23 pairs, 23 chromosomes coming from the mother and 23 chromosomes coming from the father. Each of the 23 pairs of chromosomes can be distinguished in shape from the others. Each chromosome is a single long piece of DNA. Each of the 46 pieces of DNA is double-stranded and is shaped like a spiral staircase. Along the double-stranded DNA pieces there are four components or bases, which are abbreviated A, T, C, and G. These four bases are the alphabet, which forms "words" that the biological machinery of the cell can interpret. The information provided by the bases tells the cell what to do and how to work. The double-stranded feature of DNA allows it to pair bases in a certain way: an A is always paired across from a T, and a C is always paired across from a G. Dr. Cotton explained that the strand of DNA is like a "zipper" in that it can be chemically "unzipped" and then put back together again. It is that ability to take DNA apart and put it back together which is one of the major components in DNA identification technology.

Dr. Cotton described the process utilized at Cellmark for extracting DNA. She stated that the technicians will take a biological sample, blood, saliva, semen, bone, or muscle tissue, and rupture the cells, releasing the DNA into a small amount of solution. Through a series of steps, they remove the unwanted portions of the cell, leaving a small amount of purified DNA.

Dr. Cotton noted that for identification purposes they will look for pieces of DNA that vary from one person to the next. A restriction enzyme is a protein that is isolated from bacteria and is used in the DNA identification technology to cut out pieces of DNA that will be useful in the identification process. The restriction enzyme is added to DNA in a test tube to cut it into pieces. The pieces of DNA are then spread out and separated by size by a process known as electrophoresis, so that the information can be read. This process utilizes a tray containing a quarter-inch layer of agarose, a gelatin-like substance,

with indentations across one end. The DNA samples are placed in the indentations, and an electric current is placed across the gel. Because the DNA pieces have a slight charge, they will move in the electric field and the agarose gel acts like a sieve so that small pieces of DNA will move rapidly through the gel and larger pieces will move more slowly.

A nylon membrane is then laid across the gel, and over that, a number of paper towels and a weight. The paper towels absorb the solution in the gel so that the DNA and the solution will move up through the gel toward the towels with the DNA binding to the nylon membrane. This process is known as a Southern blot.

The next step in the process involves taking radioactively treated DNA, called a DNA probe, and adding it to a solution into which the nylon membrane has been placed. The probe functions with the DNA on the membrane for a period of 16 to 18 hours, allowing the pieces of DNA to zip up with pieces that have the opposite series of A's, T's, C's, and G's in a very specific manner, so that now there is radioactivity bound to each of these positions. X-ray film is then laid over the piece of nylon for each of the samples, the film is exposed to the dark, and everywhere that the probe bound to the pieces of DNA with the complimentary sequence, the radioactive emissions will expose the X-ray film showing dark bands. This process is known as autoradiography, and the developed film is called an autorad. The position of these bands on the autorad reflects the distance traveled or size of that piece of DNA.

Dr. Cotton explained that Cellmark uses four DNA probes at one time to produce a pattern of bands. This pattern will be compared with the pattern produced by the other samples in order to determine whether the samples were produced by the same person. If the patterns are different, they had to have been produced by different people. If the patterns are the same, the likelihood of whether the samples came from different people can then be calculated or estimated. She noted that all labs do not use the same DNA probes, but as long as the probe recognizes differences in people, it is useful for identification. Dr. Cotton stated that the probes used by Cellmark in the DNA identification process are generally accepted in the scientific community.

The entire process used by Cellmark Laboratories is listed in a protocol book and is followed by the technicians in the laboratory. The procedures were developed by the Cellmark group in England. She stated that the components for extracting DNA, the use of the restriction enzyme, the use of a gel, and the Southern blot procedure

were all used for research purposes since the mid-1970's. The concept of DNA identification was developed in the early 1980's when it was discovered that DNA fragments varied enormously in the population. In 1985 Alen Jeffries discovered a set of probes which varied so much that it was highly unlikely that you would find two people that shared the same pattern of fragments, and Jeffries published research in that year hypothesizing that genetic information could be used to answer questions of paternity and questions of identification. Dr. Cotton stated that DNA testing has been used forensically since 1985 and on a commercial basis since 1987.

Dr. Cotton testified that Cellmark was engaged by the defense counsel to test certain evidence which was gathered in the investigation of the alleged sexual assault upon the victim in the instant case. The evidence which she received was a pair of underwear to which a sanitary pad was attached. Dr. Cotton identified People's group exhibit 15 as the Federal Express envelope containing the evidence sent to Cellmark by defense counsel and received by Dr. Cotton on March 21, 1990. Dr. Cotton identified People's group exhibit 15A-1 as the evidence contained in the Federal Express envelope and stated that the bag containing the evidence was sealed when it was received at Cellmark. She noted the receipt of this evidence on an evidence-receipt sheet in their laboratory contemporaneously with the opening of the bag.

Dr. Cotton and Julie Light, another Cellmark employee, examined the evidence and cut a small section from the panties, marking in blue ink the section on the fabric where the cutting was taken. The cutting was cut up into smaller pieces and placed into a tube marked "sample number 01." The underwear was resealed in the paper sack. Dr. Cotton personally performed the extraction of the DNA from the sample taken from the underwear. The process involved extracting DNA from any non-sperm cells and then extracting the DNA from the sperm cells. This process can be accomplished because the outer walls of sperm cells are harder to rupture then the outer walls of other cells. Dr. Cotton stated that the final results showed that there were two people's DNA that came from that sample taken from the underwear.

The extracted DNA samples, contained in small test tubes, were turned over to Ms. Light on May 7, 1990. Ms. Light performed the extraction of DNA from the standards submitted for the victim and the defendant. Dr. Cotton reviewed and concurred in the results of those extractions. Ms. Light also placed the DNA samples in the

agarose gel and performed the electrophoresis, the Southern blot procedure, the DNA probe, and the autoradiography.

Dr. Cotton noted that it is not always possible to extract DNA from every item of evidence sent to the laboratory and that the process will not work if there is insufficient DNA in the sample. In the instant case, the sample taken from the underwear located in People's group exhibit 15A-1 contained a sufficient amount of DNA in order to base an opinion as to whose DNA was contained on that exhibit.

Dr. Cotton examined the autorad pattern for the DNA extracted from the sample compared with the pattern for the DNA extracted from the standards which had been submitted to Cellmark Laboratories for the victim and the defendant. Dr. Cotton stated that she found DNA which had been extracted from the underwear sample consistent with having come from the victim and DNA that matched the DNA from defendant. Dr. Cotton did not offer an opinion within a reasonable degree of scientific certainty as to whether or not there was a match between defendant's standard and the sample.

Dr. Cotton admitted on cross-examination that the greater percentage of human DNA is similar to the DNA of another individual; it is only by comparing the differing DNA that the DNA identification process is accomplished. She also admitted that it is important for the accuracy of the results that the DNA sample be adequately stored, for under certain conditions the DNA could be destroyed, in which case no result could be obtained under the DNA identification process. Dr. Cotton explained that the sample from which the DNA is to be extracted is affected by conditions such as the environment and temperature. Optimum storage conditions for various samples will differ; tissue samples should be frozen, whereas stains should be kept cool and dry. Dr. Cotton admitted that she had no background information on how the panties contained in People's group exhibit 15A-1 had been stored prior to her receipt of them at Cellmark Laboratories. She stated, however, that while the DNA extracted from that article had degraded somewhat, it had not degraded to such an extent that it could not produce a usable pattern.

She also admitted that while the rate of movement of DNA in the agarose gel can be affected by the amount of DNA put in the indentation for each sample, there should not be any detectable difference as long as the sample quantities do not greatly differ. She stated that in the instant case she ran a preliminary process known as a yield gel or mini-gel on a small amount of the sample taken from the underwear evidence in order to estimate the proper quantity of sample to be placed in the agarose gel for the electrophoresis. Dr. Cotton stated

that, in her professional opinion, only rarely are samples affected by contamination, such as bacteria, but in those cases the evidence was not properly stored so that the bacteria was allowed to degrade the stain. In those cases it will be apparent in reading the autorad that the DNA had been degraded. She denied that bacterial DNA will affect the migration of the human DNA in the gel. She stated that the DNA sample extracted from the panty cutting could have contained some bacterial DNA and she would not have detected that in her test.

Dr. Cotton testified that Cellmark Laboratories has been using the same four DNA probes for forensic purposes since she came to the company in January 1988. Their laboratory adds all the probes to the solution containing the membrane at once, while other laboratories add their probes one at a time. Another difference in their procedure from the other labs is that, after the four probes are added all at once, the membrane is washed and each probe is then added one at a time. She denied that it would be possible for the probes to attach to bacterial DNA under their testing conditions. She had heard of this phenomenon occurring at other laboratories, but it has never happened at Cellmark Laboratories.

Dr. Cotton testified that she was familiar with proficiency tests that were administered at Cellmark by the California Association of Crime Laboratory Directors. In these tests, the agency submitted two sets of 50 samples to Cellmark from which the laboratory had to extract the DNA and then identify DNA matches. The agency then checked Cellmark's results with the correct answers. In each set of 50 samples Cellmark had one incorrect match due to an error on the part of the person doing the test. Dr. Cotton stated that in many instances if the lab technician performs a procedure incorrectly, there will be no obtainable result in the testing. However, if the mistake is mixing two samples together, then an incorrect result can result. Dr. Cotton stated that because the problems in the proficiency tests were due to human error, Cellmark has taken steps to analyze where in the process the error took place to minimize the chances of that same type of error occurring in the future.

Dr. Cotton admitted that she was familiar with the case, State of Delaware v. Steven Pinnell, because she gave testimony in that case. She stated that her testimony addressed the results of the California proficiency test and also the specific work done in that particular case. Dr. Cotton also was familiar with a Maryland case involving a stillborn baby abandoned in an automobile, in which Cellmark was asked to determine whether the baby's DNA matched the DNA of the woman who owned the vehicle. Cellmark determined that there was a

match between half of the DNA's banding pattern for the baby (the other half coming from the father for whom no standard was available) and the standard for the woman. Dr. Cotton had no knowledge that the report issued was in error; she insisted that, to her knowledge, no charges were filed in the case because the infant was determined to be stillborn. Dr. Cotton testified that she was familiar with an article written by Eric Lander commenting on this Maryland case. Defendant did not pursue this line of questioning.

Dr. Cotton testified that she is familiar with the term "false positive," which refers to an incorrect match or determination. She stated that there is a two-step process involved in analyzing the data from a DNA test: first, determine whether or not the two patterns match and, if they do, calculate the frequency with which this pattern would occur in the population. This calculation uses a population data base, such as for Caucasians, and involves extraction of DNA for 200 unrelated Caucasian individuals, viewing the DNA bands produced with a given DNA probe and determining how frequently a band in a given position with a given DNA probe occurs. She stated that the majority of the Caucasian samples were taken from a blood bank in Delaware.

Julie Ann Light testified that she is a staff molecular biologist employed for the last three years by Cellmark Diagnostics Laboratories in Germantown, Maryland, as a forensic case worker. In this capacity she is responsible for the evidence submitted to the laboratory, extraction of DNA from that evidence, and the entire remainder of the procedure and interpretation. Prior to her employment with Cellmark she was employed by a biochemical laboratory using the processes of hybridization, autoradiography, gel electrophoresis, and Southern blotting, and during this prior employment Ms. Light had the opportunity to work with these processes approximately 100 to 150 times.

Ms. Light holds a bachelor of science degree in zoology and is presently pursuing a master's degree in forensic science from Georgetown University in Washington, D.C. She has processed over 130 forensic cases during her three-year employment at Cellmark Laboratories, and an average case involves three different pieces of forensic evidence. She has also performed these procedures in connection with her forensic training at Cellmark and in connection with the paternity-testing department in which she was involved prior to her forensic training and testing. Ms. Light has qualified to testify as an expert in the field of molecular biology as applied to DNA identification in 14 criminal cases in six different States.

Ms. Light admitted that Cellmark is only her second employment since she received her bachelor's degree in 1984 and that she has not

yet authored any articles in the field of DNA, is not a member of any scientific communities, panels, or organizations, and has not received any researchships in the area of molecular biology. She admitted that her only training in forensic cases has been received through her employment at Cellmark and that two of her supervisors did not have Ph.D. degrees. The supervisors in the laboratory who review her casework, however, do have doctorate degrees.

Part of Ms. Light's training at Cellmark involved validation samples given to her by her supervisor on which she performed the entire DNA procedure and then reported her results. The samples included swabs which contained DNA from two differing sources, but she admitted that because the samples were received in the laboratory there was no chance of bacterial contamination. Over defendant's objection the court recognized Ms. Light as an expert in the limited field of molecular biology as it relates to DNA identification.

Ms. Light testified that she first came into contact with evidence relating to the instant case on March 21, 1990, when People's group exhibit 15 was received at Cellmark Laboratories. The exhibit was assigned to a particular scientist, Dr. Robin Cotton, and Ms. Light was present when Dr. Cotton opened the envelope containing the evidence. Ms. Light identified People's group exhibit 15A-1 as the brown paper bag containing the evidence, a pair of underwear with a sanitary napkin attached and some hairs. She stated that a Polaroid snapshot was taken of the underwear on that date, and she identified People's exhibit 23 as that photograph.

Ms. Light watched Dr. Cotton as she performed the DNA extraction on the underwear sample. The section of underwear was first placed in a tube with salt solution and detergent and placed in a water bath overnight. Next, the material in the tube was drawn up into the top of the tube, and the tube was placed into a centrifuge to draw the remaining moisture from the material. The dry material was placed into a second tube into which additional salt solution and a stronger detergent were added. Ms. Light stated that a pellet had formed in the bottom of the first tube after the centrifuge action, with a clear liquid on top of the pellet. That clear liquid was removed and placed into a third tube. Phenol chloroform, which acts to release DNA from cells, was added to the clear liquid in the third tube. More salt solution and detergent were added to the first tube containing the pellet and the second tube containing the material, and the material in the tube was again spun dry with the centrifuge. DNA was then extracted from the sperm cells in the the first and second tubes.

When Dr. Cotton completed the process she delivered the three tubes containing DNA to Ms. Light. The third tube, marked "Extract 1," contained a DNA extract from vaginal-wall cells (the woman's DNA), while the first and second tubes, "Extract 2" and "Extract 3," contained DNA from the sperm cells. A mini-gel electrophoresis was then run to identify the quality and quantity of DNA in the three extracts.

Ms. Light began her work on the case on May 7, 1990. Cellmark requires that certain parts of the DNA identification procedure be witnessed by another scientist, and Ms. Light testified that her work was so witnessed by a second individual. She received blood-sample standards from the victim and the defendant on May 8, 1990, and she identified People's group exhibit 24A as the sealed box containing the standards on that date. She filled out an inventory sheet for the two tubes of blood taken from defendant and the victim.

The first step performed by Ms. Light in the extraction of DNA from the blood standards was the process known as lysing, which releases the DNA from the white blood cells found in the blood. In this process she added salt solution and detergent to a small sample of the blood and then added phenol chloroform to isolate and purify the DNA. She stated that she was able to extract DNA from the blood standards and then proceeded to the restriction enzyme portion of the test, which cuts the DNA into fragments. She explained that the enzyme is very specific as to the location on the DNA where the DNA will be cut, much like a molecular "scissors" which might cut a section of the newspaper everytime it comes across a particular word.

Ms. Light next ran the process known as gel electrophoresis. The DNA restriction fragments created from each of the samples were placed in perforations or lanes in the gel: extract 1, which was taken from the female cells found on the underwear; extracts 2 and 3, which were DNA taken from sperm cells located on the underwear; extract 02, which was DNA taken from the victim's blood; and extract 03, which was DNA taken from the defendant's blood. Ms. Light also loaded lanes in the gel with three control DNA fragments: Lambda, 1 KB, and TDS (DNA extracted from the blood of one of the Cellmark employees).

Ms. Light explained that when electrical current is applied to the gel, the DNA molecules begin migrating through the gel matrix, which acts like a sieve, such that the very small fragments which have been created with the restriction enzyme move more quickly through the gel than the larger fragments. This process continues for 20 hours, or until the Lambda control band reaches 20 centimeters, at

which time the electrophoresis process is halted and a Polaroid picture is taken showing the migration of two of the three controls.

The gel is then washed with three buffers. The buffers act to "unzip" the DNA fragments. The process known as the Southern blotting is then performed, where the DNA fragments are lifted from the gel and incorporated on a nylon membrane in the same pattern they held after the electrophoresis. The next steps in the DNA identification process, where the DNA probes are added to the nylon membrane and the autoradiograph is created, were not performed by Ms. Light but were performed by two individuals in the hybridization laboratory.

Ms. Light testified that Cellmark's sister company in Great Britain supplies them with DNA probes, which are sections of DNA for which the base sequence is known, for example, a whole string of "A's," a whole string of "C's," or "A's-T's," "A's-T's." These sequences are tagged with radioactivity.

In the hybridization laboratory, the nylon membrane is placed into a tupperware container containing some solution, and the radioactive DNA probes are then added to the membrane. The radioactive base sequences will recognize and attach to fragments with the complimentary structure, i.e., the string of "A's" will attach to a fragment which is all "T's." Any fragments which have not joined with the probe will not bind to the membrane and will be washed off the next day.

The radioactive piece of nylon membrane is put next to a piece of X-ray film for a certain length of time and developed, resulting in a picture of the DNA banding patterns called an autoradiograph. A typical DNA banding pattern will have at most eight bands in one lane; however, some people may only produce six or seven bands.

Ms. Light stated that an autoradiograph was produced by the hybridization department utilizing the procedure outlined above, and she identified People's exhibit No. 26 as the original autoradiograph produced in this case. She stated that the first two lanes show the patterns for the control DNA (Lambda and 1KB); lane 3 was left blank; lane 4 shows the pattern for TDS, the internal control; lane 5 was a space; lane 6 shows the pattern for the female portion of the DNA extracted from the underwear; lane 7 was a space; lane 8 shows the pattern for the DNA extracted from the victim's blood; lane 9 was a space; lane 10 shows the pattern for the 1KB control DNA; lane 11 is a space; lane 12 shows the pattern for DNA extracted from the defendant's blood; lane 13 is a space; lane 14 shows the pattern for the DNA extracted from the sperm pellet in tube 1; lane 15 is a space; lane 16 shows the pattern for DNA extracted from the sperm

fragment after the second washing of the material in tube 2; lane 17 is a space; lane 18 shows the pattern for the Lambda control DNA; lane 19 shows the pattern for 1KB control DNA; and lane 20 was left blank.

Ms. Light stated that she examined the autoradiograph to see if there were any banding patterns which matched one another. She explained that two banding patterns are said to be consistent if they visually appear to be closely aligned; however, for there to be an actual match between two bands, according to criteria determined by Cellmark Diagnostics, a computer camera enhancer must show alignment of the bands falling into one millimeter of space, plus or minus. She stated that this criterion was chosen because one millimeter is the measurement of the gel's ability to differentiate one band from another within a gel. Ms. Light found that the banding pattern in lane 6, for the female DNA from the underwear, was consistent with the banding pattern for the victim's DNA located in lane 8, but that these bands did not meet their match criteria. Ms. Light also found that the banding pattern from lane 16, containing DNA extracted from sperm obtained from the second washing of the material, matched the DNA banding pattern of the defendant's blood, located in lane 12, and that the banding pattern from lane 14, which contained DNA extracted from the sperm pellet, was consistent with the banding pattern of the DNA extracted from defendant's blood, located in lane 12. She explained the failure of the banding patterns in lanes 6 and 8 to meet the match criteria as possible degradation of the DNA from the vaginal portion of the underwear stain and opined that the failure of the banding patterns in lanes 14 and 12 to meet the match criteria was due to loading too much DNA in lane 14, more than there was in the comparable lane for the DNA from the defendant's blood.

Ms. Light testified that in addition to her work being reviewed at various points in the process, her interpretation of People's exhibit 26 was confirmed by at least two other scientists at Cellmark as part of its operating procedure. The purpose of this review and confirmation is to ensure that the procedure is followed adequately and to ensure that the scientist's interpretation is correct.

Ms. Light was asked if she had reached a conclusion within a reasonable degree of scientific certainty as to the identity of the persons who contributed the DNA in the stains analyzed from the underwear submitted to Cellmark for DNA identification testing. Counsel for defendant objected to this question on grounds of foundation and also stated that Ms. Light was not qualified as an expert in this particular area to give a scientific opinion. The court overruled defendant's ob-

jection, stating that Ms. Light's qualifications and the extent of her experience went to the weight to be given to her opinion and not to its admissibility. The court further noted that it had already found Ms. Light to be qualified as an expert for purposes of this limited field. Ms. Light offered her opinion that the DNA banding pattern obtained from the underwear as it applied to the sperm section matches the DNA banding pattern obtained from the blood of the defendant. She also stated that visual and computer matching of the DNA bands is a scientifically accepted procedure for matching these bands. She noted that it was counsel for the defendant who submitted the underwear and the blood samples to the lab for this DNA analysis.

Ms. Light stated on cross-examination that the DNA probes only recognize human DNA and, so, if there were bacterial contamination of the sample, the DNA probes would not attach to the bacterial DNA. However, such contamination may also degrade the sample taken from the evidence, and if that occurred, portions of the band may disappear or there may be a slight variation in pattern. She also admitted that the rate of migration through the gel can be affected by contamination.

Ms. Light also testified on cross-examination that there were some statistical analyses done as a result of the interpretation of this case, which she was involved in computing. She had concluded from this computation that the frequency in the Caucasian population, of which defendant is a member, of the DNA banding patterns attained from DNA extracted from sperm on the victim's underwear and from the blood of the defendant was approximately 1 in 12,000. Ms. Light testified that statistical extrapolation is part of the standard procedure in the DNA analysis after a match is determined to be found. After counsel for defendant was informed of the results of the sample testing showing that a match existed and that further testing could be started, counsel informed Cellmark that further testing must be upon the advice of the State's Attorney. The statistical computation was made at the request of the State's Attorney's office.

Dr. Michael Conneally testified for the State that he is a Professor of Medical Genetics and Neurology at Indiana University Medical Center in Indianapolis. Dr. Conneally holds a bachelor's degree in science and master's and doctorate degrees in genetics and statistics. Dr. Conneally is also nationally board certified in medical genetics since 1982. He is a member of the American Society of Human Genetics and is on the board of directors of this organization. He is also a member of the Human Gene Organization and the American Association for the Advancement of Science and is chairman of the genetics

task force and on the scientific advisory council for the Muscular Dystrophy Association. Dr. Conneally teaches Ph.D. candidates and medical students and does research in the area of human genetics. His research work is focused on the human diseases known as muscular dystrophy, familial Alzheimer's disease, and Hunington's Chorea.

Dr. Conneally is the editor of the following journals: Human Heredity, the Journal of Medical Genetics, and the Journal of Neurogenetics, and his curriculum vitae, which lists the publications which he authored or to which he contributed, was admitted into evidence as People's exhibit 29 for the purpose of establishing the doctor's credentials. Dr. Conneally has testified as an expert over 100 times, mainly in the area of human genetics as it relates to paternity testing, but has testified on 12 occasions in eight States and twice in Federal court regarding forensic identification of DNA. Dr. Conneally admitted that he has never performed any DNA extractions, but he stated that he is in charge of the laboratory at Indiana University where such work is performed by technicians. He has examined at least 500 autoradiographs, however, in connection with his scientific research and in forensic cases. The court recognized Dr. Conneally as an expert witness in the field of human genetics and statistics, without objection by the defendant.

Dr. Conneally stated that it is generally accepted within the scientific community that a scientist may view an autoradiograph and determine whether it is of high quality or not. It is also generally accepted in the scientific community that a scientist such as himself may inspect an autoradiograph to determine whether there are any matching banding patterns.

Dr. Conneally is familiar with Cellmark Laboratories and the procedure used at Cellmark to extract DNA and produce autoradiographs from these extractions, from reading their protocol. He opined, over the objection of defendant, that the procedure used at Cellmark is generally accepted in the scientific community as being the proper procedure for the extraction and identification of DNA.

Dr. Conneally noted that there are only three laboratories in the United States which actually perform the DNA extraction and identification to be used in forensic cases: Cellmark, the FBI, and Lifecodes. Dr. Conneally is also familiar with the procedure used by the FBI laboratory in Washington, D.C., for the extraction and identification of DNA in forensic cases and stated that their procedure is generally accepted in the scientific community as being proper. He similarly is familiar with the DNA extraction and identification procedure at Lifecodes Laboratory and at the FBI by reading publications re-

viewing their procedures. Dr. Conneally stated that the three laboratories use differing probes in their DNA identification processes for proprietary reasons, and he noted that if identification is done by more than one laboratory on the same sample using differing probes, the finding of matching bands by both laboratories becomes even more conclusive. Moreover, the fact that the laboratories use different restriction enzymes in their identification process does not impair the validity of the results.

Dr. Conneally testified on cross-examination that it is a generally accepted principle that every human being has different DNA, except for identical twins. He stated that there are perhaps 3 billion bases making up every human being's DNA, 10% of which are functioning genes creating the proteins that make us what we are, and 90% of which are nonfunctioning DNA, unique to each individual. This 90% of human DNA includes so-called "VNTR's" (variable number tandem repeats), pieces of DNA that repeat over and over in varying number from person to person, and accordingly VNTR's are used for DNA identification purposes because they show the uniqueness of an individual. Dr. Conneally also explained that restriction enzymes are used in the DNA identification process to break off VNTR's, and the radioactive probes are used to "light up" the VNTR's that show the differences between people; those VNTR's correlate to the bands seen on the autoradiograph. Dr. Conneally agreed that it was possible, if using one probe and viewing one band, to find a match coming from different people. However, Dr. Conneally opined, as more bands and more probes are used, the chances of getting a match from different individuals approaches zero.

Dr. Conneally is familiar with the case work done by Cellmark laboratories in the instant case, has reviewed the laboratory's case file and autoradiograph produced as part of the DNA-identification procedure, and identified People's exhibit 26 as that autoradiograph. He stated that he was able to determine by looking at this exhibit that the quality of production of this forensic autoradiograph is excellent and that Cellmark had been able to obtain sufficient forensic material to get good pattern results. Dr. Conneally admitted on cross-examination that he had not personally viewed Cellmark's operating procedure in the laboratory but stated that if there had been any major problem in the procedure the banding pattern would not have turned out as nicely as it had in the instant case. He explained that this is one reason the laboratories use control DNA, so that they can determine if the control has produced bands identical to those produced in other DNA tests.

Dr. Conneally also admitted that he has spoken with Ms. Light and Dr. Cotton on prior occasions in relation to this case but insisted that he did not discuss with them their opinions of the results found in this case. It was Dr. Conneally's opinion within a reasonable degree of scientific certainty, after his examination of People's exhibit No. 26, that the lane referred to on the autoradiograph as "Donald Mehlberg" matched two other bands referred to as "white cotton panties with sanitary napkin attached." Dr. Conneally is familiar with the scientific terms "matching" and "consistent" as they relate to the bands on the autoradiograph. He stated that the commercial laboratories such as Cellmark had very conservative criteria (in favor of the defendant) for determining whether there are matching bands, but according to his visual inspection of the autoradiograph, the above-stated lanes matched. He also opined that the lanes for DNA banding patterns from the victim's blood and from the victim's cells in the underwear matched, although the bands from the DNA extracted from vaginal cells on the underwear were fainter and there was a slight shift. This could occur because there was very little DNA produced from the victim's cells on the underwear.

Dr. Conneally is also familiar with the sample Cellmark Laboratories developed for their statistical analysis. He stated that statistics are used in the interpretation of DNA evidence finding a match to determine the frequency of a particular banding pattern occurring in someone other than the defendant in the overall population. If no match is found, the individual can be excluded as the contributor of the DNA on the forensic evidence. If a match is found, however, the scientist must calculate the frequency of that particular band or series of bands occurring in an individual other than the defendant in the defendant's ethnic population. In order to make this calculation, Cellmark typed a random sample of 160 to 250 Caucasian individuals to show how common these bands would be in the Caucasian population. He stated that Cellmark draws its samples from their paternity testing and sometimes from blood donors of that particular race. Dr. Conneally did not feel it was necessary to develop a more narrow sample, such as for German or Irish Caucasians, in order to obtain more accuracy. He did admit that if one of defendant's parents were black, rather than both being Caucasian, such factor could affect the statistical analysis.

Dwight Adams testified for the State that he is a special agent with the Federal Bureau of Investigation, currently assigned to the DNA analysis unit of the FBI laboratory in Washington, D.C., and has been an agent for approximately seven years. He holds bachelor and

master of science degrees in biology as well as a Ph.D. in biology. Prior to working for the FBI, Dr. Adams was a research assistant in biology at the University of Oklahoma and an instructor of biology at Central State University in Oklahoma.

Dr. Adams' responsibilities include the examination of evidence submitted by Federal, State or local law enforcement agencies conducting a criminal investigation. This examination consists of a technique known as DNA analysis and is performed on body-fluid stains, such as semen or blood, and on known blood samples. The results are then compared in order to determine the origin of the body-fluid stain that is on the evidence. His training in this area consisted of body-fluid identification and characterization, graduate course work from the University of Virginia in DNA profiling, molecular biology, and body-fluid identification, and undergraduate course work in the areas of molecular biology, genetics, population biology, and biochemistry. He also trained at the Forensic Science Research and Training Center at the FBI Academy at Quantico, Virginia. As part of his continuing education, Dr. Adams reviews scientific literature as it relates to the field of DNA analysis in forensic cases, and he has presented a number of papers at scientific meetings in relation to research conducted in DNA analysis.

His primary research has been the validation of the FBI's procedure for DNA analysis, before it began using this technology on actual forensic cases in 1988. This research concerned the reliability and reproducibility of the DNA analysis procedure by subjecting all types of forensic stains to a variety of conditions, including combining the stains with different chemicals which might be found in association with the evidence and subjecting the stains to high temperatures, sunlight, and other extreme environmental conditions which could affect an item of evidence. This research showed that contamination or environmental insult to a body-fluid stain will either produce a correct result or no result at all; such contamination will not produce a false result.

Dr. Adams has authored or coauthored a number of articles in scientific journals and chapters in three different books related to the subject of DNA analysis or DNA profiling. He belongs to the American Academy of Forensic Science and the International Electrophoresis Society. Dr. Adams has performed the DNA profiling procedure thousands of times and has been qualified as an expert in this field in 19 State or Federal courts, over 50 times. He has testified for the defense in a prior case. The court recognized Dr. Adams as an expert in the field of molecular biology as it relates to the analysis of DNA.

Dr. Adams testified that he received some items of evidence in sealed mailing envelopes from the Litchfield police department in September 1989. After reviewing these items, he chose two stains which had previously been identified as containing semen, a portion of a vaginal swab and a cutting of the panty liner attached to the victim's underwear, and the two known blood samples, from the victim and the defendant, to perform the DNA analysis. The final result of this analysis was the production of an autoradiograph showing the banding pattern from the DNA samples. He stated that the samples of DNA were substantial enough so that he could draw conclusions from his analysis of the autoradiographs' banding patterns. Dr. Adams identified People's exhibit 30 as the envelope containing five different autoradiographs produced in the DNA analysis of the vaginal swab, panty liner, and two known blood samples in the instant case.

Dr. Adams stated that the FBI laboratory's protocol calls for the use of specific probes in the DNA analysis and a specific restriction enzyme to cut the DNA fragments. He stated that the restriction enzyme is chosen for its ability to work with their DNA probes. He also opined that the use of different restriction enzymes by various laboratories had no effect on the reliability or producibility of their results. The FBI and Cellmark have one probe which they use in common, D1S7S or MS1, which the FBI purchased from Cellmark Diagnostics.

Dr. Adams stated that a "cocktail" autoradiography refers to the process of mixing several different probes and producing an autoradiograph with that complete mixture. The FBI laboratory does not follow that procedure; instead, it uses one probe at a time to produce one autoradiograph at a time, and the five autoradiographs contained in People's exhibit 30 were the autoradiographs produced from the five probes used by the FBI in its DNA analysis in the instant case. Dr. Adams explained on cross-examination that they did not use the cocktail method because even with that method the technician must still go back and do each probe individually to learn which bands are associated with which probe.

Dr. Adams examined the autoradiographs after they were produced, using both a visual comparison and a computer-assisted interpretation, in order to determine whether any of the banding patterns matched. Dr. Adams found that the DNA from the semen identified on the vaginal swab and the panty liner matched the DNA from the known blood sample for the defendant, using probe D2S44. He also found, using probe D17S79, that the DNA from the semen on the swab and the panty liner matched the DNA from defendant's known blood sample. Using probe D1S7, he also found a match of the DNA

profile from the semen on the swab and panty liner to the known blood sample of defendant, and using probe D14S13, Dr. Adams was again able to determine that there was a match between the profile results produced from the semen on the swab and panty liner and the DNA profile for defendant. Only with one autoradiograph, People's exhibit 30D, was Dr. Adams unable to make an interpretation, because the banding patterns fell outside the location markers set by his laboratory's protocol and because of the nature of the particular probe which was used. The only conclusion he could draw from People's exhibit 30D was that he could not exclude defendant from matching the DNA profiles of the semen. The fact that one probe produced an inconclusive autoradiograph does not invalidate the four other conclusive autoradiographs, in Dr. Adams' opinion. Dr. Adams also found a match of the DNA from the vaginal fluid to the known blood sample of the victim in each of the five autoradiographs. The items of evidence were repackaged in a large manila envelope, sealed, and returned to the Litchfield police department on January 2, 1990.

Dr. Adams admitted on cross-examination that the Litchfield police department sent cuttings from the swabs and the panties and panty liners rather than the entire item of evidence and that the blood samples received were dried bloodstains rather than whole-blood samples. He also admitted that while a technician was present through portions of the process performed by Dr. Adams and was assigned to do the hybridization process and prepare the autoradiogram, Dr. Adams was not present through all phases of the work done by the technician. Dr. Adams opined that if a person with his qualifications was familiar with the particular probes and enzymes used by a technician, as in the instant case, it would be possible for that person to examine an autoradiogram produced by that technician and to draw conclusions therefrom.

Dr. Adams denied that he assumed that he was looking for the semen of only one male when he performed the DNA analysis, and he insisted that the technology used by the FBI could detect DNA from a number of different individuals. He stated that the only way he would not have been able to detect DNA from another individual would be if the semen produced by that individual was in such small quantities that there would not have been sufficient DNA to produce a result. Moreover, Dr. Adams insisted, if he had detected more than one male individual's DNA on the profile, he would have requested additional samples from other possible contributors. Dr. Adams reiterated that no other profile was detected other than the profile matching the defendant. He also stated that research has shown that no

matter what DNA sample is taken from an individual, they will always have these specific portions of the DNA molecule that will always react and produce the same results on an autoradiograph.

Dr. Adams admitted that the procedure utilized by the FBI has never been subject to a proficiency test by an outside agency, and all proficiency testing of personnel is provided internally by the FBI's Forensic Science Research and Training Center. To his knowledge in the history of DNA analysis by the FBI, there has never been an error made in determining whether one sample matches or does not match another sample.

Dr. Adams testified on cross-examination that as a result of his findings of a match between the DNA profiles for defendant's known sample and the semen stain on the pantyliner and the swab, he did a statistical analysis to determine the significance of the matches by comparing the profile for defendant's known blood sample to a population data base. In the instant case, Dr. Adams used a Caucasian population base, primarily comprised of 300 FBI agent trainees from all around the country, whose blood samples were drawn and on which the same DNA analysis had been run, in order to determine how frequently that same DNA profile occurs in the population. He also indicated that it was unnecessary to narrow the Caucasian population data base to specific ethnic groups such as Germans, Irish, or Italian.

Dr. Adams was asked on cross-examination what conclusion he may have drawn from his statistical analysis, and he testified that the likelihood of finding another unrelated individual chosen at random from the Caucasian population with the same DNA profile as defendant's was 1 in 1.7 million.

Defendant objected to the admission of People's exhibit 30 and the five autoradiographs contained therein, People's exhibits 30A, 30B, 30C, 30D, and 30E, on grounds that there was an inadequate foundation for Dr. Adams to testify concerning the results of the tests performed because the technician who produced the autroradiograms under Dr. Adams' supervision was not present to testify. The court ruled as a matter of law that, as in the case of the foundation necessary for the introduction of X-ray evidence, an autoradiogram developed as part of DNA analysis may be admitted upon the testimony of the doctor under whose supervision it was produced, and the court admitted into evidence People's exhibits 30A, 30B, 30C, 30D, and 30E. Defendant's motion for a directed verdict was denied.

Officer Elledge was called as an adverse witness on behalf of the defendant and admitted that from his investigation of the crime scene there was no indication of a forced entry. He also admitted that dur-

ing his investigation he was given a description of clothing and a mask that the alleged perpetrator may have had on, and at no time has he been able to acquire any clothing, mask, or knife or anything else related to the alleged occurrence. He also admitted that no fingerprints or other physical evidence was obtainable from the crime scene, other than the clothing the victim had on that night.

Officer Elledge admitted that the victim told him that when she left her home at approximately 11:30 p.m. on the evening of July 15, 1989, she had left the house unlocked, and she did not say she had locked the front door or any other part of the house. Moreover, the victim did not identify her perpetrator when Officer Elledge took her statement. Officer Elledge also admitted that the victim's house is on a tree-lined street that is very dark at night, there is an alley behind the house, and the gate to the fenced backyard is located in the alley.

We must first address the State's motion to strike portions of defendant's brief and defendant's response thereto, which this court ordered on May 8, 1992, to be taken with the case. The State contends that the portions of defendant's brief referring to or arguing from *The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets the Defendant*, a law review article, *DNA Fingerprinting on Trial*, a science magazine article, *The Problem with DNA Tests: Cross-Examining the DNA Fingerprint*, a bar journal article, *A Question of Identity: Some Reasonable Doubts About DNA "Fingerprints"*, a science magazine article, and *Scientific Evidence*, a legal reference work, must be stricken because such material is outside the record on appeal and does not fall within the areas of common knowledge, public records, common law, statutes, legislative materials, or legal procedure of which a reviewing court may properly take judicial notice. Moreover, the State argues that a reviewing court will not take judicial notice of evidence not presented at trial where the effect of such notice would permit the introduction of new factual evidence, citing *Ashland Savings & Loan Association v. Aetna Insurance Co.* (1974), 18 Ill. App. 3d 70, 309 N.E.2d 293.

In response, defendant states that he made several challenges in his brief on appeal to the introduction and use of DNA evidence at trial, including whether the State proved that the DNA identification procedure in general has gained acceptance in the scientific community, whether the procedures used in this particular case were accurate, whether defense counsel was ineffective for eliciting harmful statistical evidence during his cross-examination of the State's expert witness, whether defense counsel was ineffective for not challenging the reliability of DNA evidence in the trial court, and whether the

DNA evidence was prejudicial because without it the State could not have proved defendant guilty beyond a reasonable doubt. In support of the arguments that the State failed to prove that the DNA identification procedures have gained general acceptance in the scientific community and that the specific procedures used in this case were not reliable and accurate, defendant cites to secondary sources which have questioned the use of DNA identification in general and the methods used by Cellmark specifically, and those sources were appended to defendant's brief in Appendices A through F. Defendant contends that reviewing courts have relied on law review articles and other secondary sources for a better understanding of complicated issues for many years and cites the following as examples of recent cases in which the Illinois Supreme Court has allowed such secondary sources to be considered on appeal: *People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070; *People v. Zayas* (1989), 131 Ill. 2d 284, 546 N.E.2d 513; *People v. Eyler* (1989), 133 Ill. 2d 173, 549 N.E.2d 268; *People v. Thomas* (1990), 137 Ill. 2d 500, 561 N.E.2d 57; *People v. McCarty* (1981), 86 Ill. 2d 247, 427 N.E.2d 147; and *People v. Keith* (1992), 148 Ill. 2d 32, 591 N.E.2d 449. Defendant argues that because the secondary-source articles referred to and appended to defendant's brief were intended to assist this court in reviewing issues related to a complicated, technical, and newly emerging scientific field, we should deny the State's motion to strike all references to those articles from defendant's brief and should consider those articles in reaching the merits of the issues. We must disagree.

Courts may take judicial notice of matters which are commonly known or of facts which, while not generally known, are readily verifiable from sources of indisputable accuracy. (*People v. Davis* (1976), 65 Ill. 2d 157, 161, 357 N.E.2d 792, 796.) A court will not take judicial notice of critical evidentiary material not presented in the court below, however, and this is especially true of evidence which may be significant in the proper determination of the issues between the parties. *Vulcan Materials Co. v. Bee Construction* (1983), 96 Ill. 2d 159, 166, 449 N.E.2d 812, 815, citing *Ashland Savings & Loan Association v. Aetna Insurance Co.* (1974), 18 Ill. App. 3d 70, 78, 309 N.E.2d 293, 299.

The above-noted articles, which defendant has attached as an appendix to his brief and has offered as authority in support of his position on these issues on appeal, are not mere informational articles intended to assist this court in reviewing issues related to a complicated scientific field but are instead an attempt to interject expert-opinion evidence into the record to impeach the expert testimony of

Dr. Cotton, Ms. Light, Dr. Conneally, and Dr. Adams given on behalf of the State. As such, this written authority offered by defendant was never subject to cross-examination by the State and constitutes evidence which was never considered by the trial court. We also note an absence of these articles as references in support of defendant's pretrial motion to exclude DNA testing results, in which he argued that the alleged scientific theory was unreliable, had not generally been declared as reliable evidence in courts of law, and had not been generally validated, or in response to the State's pretrial request to admit evidence of DNA fingerprinting identification analysis.

A reviewing court must determine the issues before it on appeal solely on the basis of the record made in the trial court. (*People v. Reimolds* (1982), 92 Ill. 2d 101, 106-07, 440 N.E.2d 872, 875.) We strike the portions of the appendix to defendant's brief on appeal containing the above-stated secondary materials and the portions of defendant's brief referring to said secondary materials and those matters will not be considered by this court in our ruling on the issues presented by defendant on appeal.

The first issue we shall address is whether the trial court erred in admitting evidence that DNA found in semen in the victim's panties matched the DNA found in the sample of defendant's blood. Defendant contends that because the DNA identification testing procedure is so new, the State has the burden of proving that the process is reliable and generally accepted in the scientific community. Defendant argues that admission of this testimony was in error because the State failed to prove that the DNA identification process had gained general acceptance in the scientific community and the State had not shown that the specific procedures used by Cellmark and the FBI in the instant case were reliable and accurate.

The Illinois Supreme Court recognizes the standard set forth in *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013, for evaluating the admissibility of new scientific techniques.[2] (*People v. Baynes* (1981), 88

---

[2]We recognize that the United States Supreme Court ruled on June 28, 1993, that the Federal Rules of Evidence provide the standard for admitting expert testimony in a Federal trial, superseding *Frye v. United States*. (*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. ____, 125 L. Ed. 2d 469, 113 S. Ct. 2786.) The Court's decision in *Daubert* is inapplicable to our determination in this Illinois State court case whether the trial court properly admitted scientific evidence on DNA identification testing, given our supreme court's adoption of the standard set forth in *Frye*. We leave the decision of whether Illinois courts will continue to recognize the *Frye* standard, in light of the United States Supreme Court's decision in *Daubert*, to our supreme court.

Ill. 2d 225, 241, 430 N.E.2d 1070, 1077; *People v. Eyler* (1989), 133 Ill. 2d 173, 211, 549 N.E.2d 268, 285.) The court stated in *Frye*:

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." (*Frye*, 293 F. at 1014.)

We note that the admission of expert testimony is within the trial court's discretion and will not be reversed on appeal absent an abuse of discretion. (*People v. Miles* (1991), 217 Ill. App. 3d 393, 403, 577 N.E.2d 477, 484.) The same standard of review applies to the admission of expert testimony concerning a new scientific technique. (*Eyler*, 133 Ill. 2d at 211-12, 549 N.E.2d at 285.) We will review the first issue presented by defendant on appeal under this abuse of discretion standard.

As noted above, both defendant and the State filed pretrial motions seeking a ruling by the trial court on the admissibility of the DNA identification analysis performed by the FBI. In its motion the State asked the court to obviate the requirement of an *in limine* hearing, pursuant to *Frye*, relative to the general acceptance in the scientific community of the six-step DNA fingerprinting identification analysis, Restriction Fragment Length Polymorphism (RFLP). The State postulated that the DNA identification process is generally accepted in the scientific community, and the ultimate issue to be resolved at trial was whether the DNA analysis unit of the FBI conformed their testing process with the DNA identification technology. The State noted that DNA fingerprinting technology is currently used in other scientific and medical areas: identification of deceased persons, investigating and treating genetically inherited diseases, proving the authenticity and origin of human cell lines used in medical research, and citizenship identification for immigration. The State argued that a significant number of independent courts of review and trial courts in other jurisdictions have ruled that the DNA fingerprinting identification analysis is generally accepted within the scientific community, making a *Frye* hearing unnecessary in the instant case. It also cited three recent Illinois trial-level cases where the court had examined the validity of DNA fingerprinting identification analysis under the *Frye* standard and had ruled that such technology was gener-

ally accepted in the scientific community. In addition, the State cited one Vermillion County case which had dispensed with the necessity of conducting a pretrial *Frye* hearing prior to the admission of DNA evidence. The State pointed out that the Human Gene Mapping Conference of the United States and all of the relevant scientific communities involved in the area of molecular biology, genetics, population genetics, and forensic sciences are unanimous in their agreement that the process is valid and is accurate. The State also pointed out that the probes used by the FBI have all been recognized by the Human Gene Mapping Conference as accurate.

The record indicates that defendant initially engaged Cellmark Diagnostic Laboratories to perform the DNA identification procedure but elected not to pursue the final step in the analysis after Cellmark determined that a match was found between the banding patterns for the DNA from the defendant's blood sample and the semen stain on the victim's panties. In defendant's pretrial motion he sought to exclude the results of the FBI's DNA identification testing, which also found a match between defendant's blood and the semen stain, as an unreliable scientific technique which was not generally validated and which had not been declared in courts of law as accepted within the particular scientific fields involved. At the July 20, 1990, hearing, defendant also sought to exclude the testing results of Cellmark Laboratories. As the State notes, the record is devoid of any affirmative request by the defendant for a *Frye* hearing to be held prior to trial.

At the hearing on these motions, the court found that while the Illinois Supreme Court had not yet ruled that the six-step DNA fingerprinting identification analysis was admissible as acceptable in the scientific community, Illinois appellate courts had done so. The court concluded, based on authority from the highest courts of sister States and the Illinois Supreme Court's holding in *Eyler*, that this would ultimately be the result in the State of Illinois. (The supreme court concluded in *Eyler* that the integral portion of the DNA fingerprinting identification analysis, gel electrophoresis, is generally accepted by forensic scientists as a reliable method of detecting genetic markers in blood and is therefore admissible. (*Eyler*, 133 Ill. 2d at 215, 549 N.E.2d at 287.) The court ruled in the instant case that DNA testing has been recognized as scientifically reliable and generally accepted in the scientific community and that it is admissible without any further foundation as to the *Frye* standard. The court noted that its ruling did not affect defendant's right to challenge in a later pretrial motion *in limine* the collection procedures, handling of specimens, methodology of analysis, and reading of the banding pat-

terns by the individual laboratories. Defendant did not file any further motions *in limine.*

Defendant points out on appeal that, although a few Illinois circuit courts had ruled on the reliability and general acceptance of the DNA identification process in the scientific community as of the date of the July 20, 1990, hearing, the trial court's finding at the hearing that Illinois appellate courts had ruled on this issue was clearly erroneous, and the State concedes this point on appeal. Defendant recognizes, however, that the fourth district has since ruled on this very issue in *People v. Lipscomb* (1991), 215 Ill. App. 3d 413, 574 N.E.2d 1345, but he insists that this court is not bound to and should not follow that decision, citing *People v. Spahr* (1978), 56 Ill. App. 3d 434, 371 N.E.2d 1261, for the proposition that appellate court opinions are binding on State circuit courts but not on other branches of the appellate court.

In *People v. Lipscomb* (1991), 215 Ill. App. 3d 413, 574 N.E.2d 1345, the fourth district reviewed the propriety of the trial court's ruling, following a pretrial *Frye* hearing, that DNA fingerprinting is generally accepted within the particular scientific fields in which it belongs, specifically, molecular biology, genetics, population genetics, and forensic science, and that the *Frye* standard did not thereafter apply to the issue of whether the specific procedures used by the laboratory to generate the evidence were reliable. The appellate court held that the DNA identification or fingerprinting procedure is generally accepted within the particular scientific fields involved and is admissible and that this includes the six-step RFLP procedure used in developing the autorads, the visual interpretation of these autorads, the manner of determining the bins, the development of frequencies, and the procedure whereby the individual frequencies are multiplied together to determine the ultimate frequency of the pattern. (*Lipscomb*, 215 Ill. App. 3d at 432, 574 N.E.2d at 1357.) We note that People v. Vincent Lipscomb (Cir. Ct. Champaign Co.), No. 89—CF—90, was one of the trial court cases cited by the State in its pretrial motion.

We also note that another of the Illinois trial court cases cited by the State in its pretrial motion has also been reviewed on appeal since trial of the instant case. In *People v. Miles* (1991), 217 Ill. App. 3d 393, 577 N.E.2d 477, as in the instant case, no pretrial *Frye* hearing was requested or conducted prior to the admission at trial of general evidence concerning the DNA identification process; however, defendant did object to the tender of the witness as an expert and to any further evidence concerning the DNA testing conducted by that wit-

ness on grounds that the scientific principles on DNA testing were not sufficiently well established to meet the *Frye* test. Defendant's objections were overruled, and the expert witness from Cellmark Laboratories then testified concerning the testing done in the case and ultimately gave opinions concerning the existence of a match and the statistical significance thereof.

The issue on review in *Miles* was whether the State failed to present sufficient evidence at trial that the laboratory techniques used by Cellmark Laboratories produced a reliable result such that evidence of a DNA match should not have been admitted. The appellate court noted that although defendant had instituted the request for DNA testing, he failed to present an expert witness to challenge the testimony of the State's experts and did not claim on appeal that DNA testing failed to meet the standards of *Frye*. Indeed, the court cited *Lipscomb* for the proposition that the DNA identification technique is generally accepted within the particular scientific fields involved and is admissible. The court held in *Miles* that the expert testimony was admissible because the evidence presented regarding the procedures used by Cellmark in this specific case did not indicate that the results produced were clearly or inherently unreliable. *Miles*, 217 Ill. App. 3d at 404, 577 N.E.2d at 484.

Defendant urges that *Lipscomb* is not applicable in our determination on appeal because the trial court did not hold a *Frye* hearing in the instant case. Moreover, defendant points out that the trial court did not make a determination at the July 20, 1990, hearing that the DNA identification process is generally recognized in the *forensic* scientific community. Defendant concludes that the trial court erred in not holding a *Frye* hearing prior to admitting at trial expert evidence that the DNA identification process is generally accepted in the forensic scientific community and, accordingly, that the admission of such evidence was an abuse of discretion.

The *Frye* standard prohibits the use of scientific evidence unless the technique has gained acceptance within the relevant scientific community. (*People v. Thomas* (1990), 137 Ill. 2d 500, 517, 561 N.E.2d 57, 63.) The trial court in *Thomas* granted the State's motion to strike the defendant's motion *in limine* for a *Frye* hearing concerning the electrophoresis procedure, relying in part upon *People v. Partee* (1987), 157 Ill. App. 3d 231, 511 N.E.2d 1165, which concluded that electrophoresis is generally accepted by forensic scientists as a reliable method of detecting genetic markers in blood and is therefore admissible in a court of law. The reviewing court held in *Thomas* that the trial court properly relied on *Partee* in foregoing a hearing on the

general scientific acceptance of electrophoresis because the *Partee* decision allowed the trial court to effectively take judicial notice of the fact that the relevant scientific community of forensic scientists has determined that the process itself is reliable. *Thomas*, 137 Ill. 2d at 518, 561 N.E.2d at 63.

On July 20, 1990, the trial court in the instant case did not have an Illinois Appellate Court decision to rely on, as the trial court did in *Thomas*, in order to take judicial notice of the scientific acceptance of the DNA identification procedure. However, the trial court was provided by the State with a review of decisions to date from sister States considering such evidence, in which it was shown that the highest courts of New York, Virginia, West Virginia, South Carolina, North Carolina, Minnesota, and Georgia and intermediate appellate courts of Florida, Maryland, Texas, and Delaware had all found the DNA identification procedure to be generally accepted in the forensic scientific community. The record indicates that the trial judge was persuaded by his examination of these decisions that the Illinois Supreme Court would ultimately rule this same way. Moreover, the trial court found that the supreme court decision in *Eyler* supported such a result. In addition, the trial court was aware at the time of the hearing that the Champaign County circuit court had held, after conducting a *Frye* hearing, that each step of the DNA identification process was generally accepted within the scientific field of forensic science and that the Vermillion County circuit court had admitted expert testimony regarding DNA evidence, over defendant's objection, without requiring a *Frye* hearing. The record does not indicate that defendant presented any memoranda of law in support of his position at the hearing.

Although the trial court in *Lipscomb* did hold a *Frye* hearing prior to ruling that DNA identification analysis was generally accepted within the field of forensic science, we note that the defendant had challenged the procedure even before he was indicted on four counts of aggravated sexual assault, filing a motion to quash the State's search warrant seeking biological samples from the defendant. The defendant in *Lipscomb* also filed a motion requesting a pretrial *Frye* hearing to determine the scientific reliability and admissibility of the DNA fingerprinting process. In *Miles*, as in the instant case, on the other hand, it was the defendant who initiated the DNA testing procedure and then sought to exclude the results. We also note that one of the issues on review in *Eyler* involved the admission of fingerprint evidence, and the defendant argued that the scientific technique known as supergluing was not shown *at trial* to be generally accepted

in the scientific community. There was no indication in the opinion that the defendant had made a pretrial motion for a *Frye* hearing with respect to the supergluing technique. The supreme court concluded that there was no abuse of discretion in admitting evidence of defendant's fingerprints obtained through the use of the supergluing technique, because the State's witnesses sufficiently established that the technique is generally accepted by the relevant scientific community. Thus, we can infer from the *Eyler* case, upon which the trial court specifically relied, that holding a pretrial *Frye* hearing is not necessarily a prerequisite to the admission of expert testimony concerning a new scientific technique. We do note that at trial of the instant case, the State presented extensive expert testimony in support of the proposition that the DNA identification procedures are reliable and have been accepted in the forensic scientific community, satisfying the standard of *Frye*.

Moreover, while a finding was not made at the pretrial motion hearing that DNA fingerprinting is generally accepted in the *forensic* scientific community, we note that at trial the court did so rule in determining defendant's motion for directed verdict made at the close of the State's case. The court stated:

> "[H]aving made the determination that the scientific principles as they are addressed to DNA analysis in general are generally accepted in the scientific community, not only for forensic purposes but for diagnostic and treatment purposes in the field of medicine, I have found that it is appropriate to use the same in a forensic setting."

This court may affirm the trial court's ruling on any ground warranted by the record. (*People v. McNair* (1985), 138 Ill. App. 3d 920, 923, 486 N.E.2d 941, 943.) We find that the trial court did not abuse its discretion in failing to hold a pretrial *Frye* hearing prior to making its determination that DNA testing has been recognized as scientifically reliable and generally accepted in the scientific community and that expert testimony concerning such scientific procedure would be admissible at trial.

We must next determine whether the trial court erred in allowing evidence that there was a match between the DNA found in the semen stain on the victim's panties and the DNA found in the sample of defendant's blood because the State did not show that the specific procedures used by Cellmark or the FBI in this case produced reliable results. Defendant urges that this court adopt the standard set forth in *United States v. Two Bulls*, which held that it was error for the trial court to determine the admissibility of the DNA evidence without

determining whether the testing procedures used by the FBI were conducted properly and remanded the cause for an expanded pretrial hearing on the admissibility of the DNA evidence. (*United States v. Two Bulls* (8th Cir. 1990), 918 F.2d 56, 61.) The State argues in response that it was not required to prove the reliability and accuracy of the specific procedures that Cellmark and the FBI laboratories used in order to show that the process of DNA fingerprinting by RFLP is generally admissible, and the State notes that the *Two Bulls* case establishes a more stringent test than that established in *Frye* for the admissibility of scientific evidence.

■ Challenges to the reliability of the scientific process in question are properly held in front of the jury by cross-examination of prosecution witnesses and presentation of defendant's own witnesses. (*Thomas*, 137 Ill. 2d at 518, 561 N.E.2d at 63.) The appellate court explained in *Lipscomb* that any question concerning the specific procedures used by the company or expert goes to the reliability of the evidence and is properly considered by the jury in determining what weight to give to this evidence; however, if the procedures used are shown to give an unreliable result, the court may find it necessary to exclude the evidence entirely. (*Lipscomb*, 215 Ill. App. 3d at 432, 574 N.E.2d at 1357; accord *Miles*, 217 Ill. App. 3d at 402, 577 N.E.2d at 483.) We similarly note that the supreme court agreed with the trial court's ruling in *Eyler* that, once the scientific process has been ruled to be generally accepted in the scientific community, defendant's challenge of the accuracy of the supergluing process performed by the expert in the case was a question properly presented to the jury for its determination and would not serve as grounds to exclude testimony concerning supergluing of fingerprints. (*Eyler*, 133 Ill. 2d at 212, 549 N.E.2d at 285.) We therefore reject defendant's contention that the trial court was required to scrutinize the procedures used by Cellmark and the FBI to determine the reliability and accuracy of the results in the instant case prior to allowing evidence at trial as to DNA testing. We will examine the evidence, however, to determine whether the procedures utilized by Cellmark or the FBI were shown to have given unreliable results such that evidence concerning the matching DNA banding patterns should have been excluded by the court.

Each of the experts at trial described the DNA identification procedure generally, and Dr. Cotton, Ms. Light, and Dr. Adams described with great detail the procedure used by his or her respective laboratory in producing the autoradiographs admitted into evidence in the instant case. Each expert testified that his or her laboratory follows a set protocol or procedure for such tests and that each step of the pro-

cedure and reading of the resulting autoradiogram is monitored or approved by other laboratory personnel. We also note the strict attention to chain of custody presented by the State with regard to the evidence and biological samples utilized in the DNA identification analysis at Cellmark and the FBI.

Dr. Conneally testified that the procedures used by Cellmark and the FBI for the extraction of DNA and the development of autoradiographs from these extractions are generally accepted as being the proper procedure in the forensic scientific community. Dr. Cotton also testified that the radioactive probes used by Cellmark are generally accepted in the scientific community and the FBI, and Dr. Conneally testified that it is generally accepted within the scientific community that a qualified scientist may inspect an autoradiograph and determine whether it is of high quality and whether it contains any matching banding patterns.

Dr. Cotton stated that portions of the DNA identification analysis, *i.e.*, extracting the DNA, using the restriction enzyme, and performing the gel electrophoresis test and the Southern blotting procedure, have been used for research purposes since the mid-1970's. She further stated that DNA testing has been used for forensic purposes since 1985 and commercially since 1987. Moreover, Dr. Adams testified that the FBI has been using the DNA identification analysis procedure on actual forensic cases since 1988 and that his research prior to 1988 involved validation, reliability, and reproducibility of the FBI's current procedure.

Except for Ms. Light, defendant did not object to the qualification of and conducted no cross-examination of the other expert witnesses for the prosecution with respect to their qualification as experts in their respective fields. Defendant was able to establish on cross-examination of Dr. Cotton and Ms. Light disagreement as to whether bacterial contamination could affect the rate of migration through the gel. However, both Dr. Cotton and Ms. Light testified that the probes used by Cellmark would not attach to any bacterial DNA which might be present in the sample. Both experts did admit that bacteria could degrade a sample, but they stated that degradation would be obvious in the autoradiogram, yielding an inconclusive result, and Dr. Conneally opined that the quality of production of the forensic autoradiogram developed by Cellmark in the instant case was excellent.

Defendant was able to bring out on cross-examination that Cellmark had less-than-perfect results on the California agency's proficiency tests concerning extraction of DNA and identification of DNA matches, but Dr. Cotton noted that the problems which occurred on

those tests had been corrected at the laboratory. Defendant also attempted to impeach the reliability of Cellmark's procedures by his cross-examination of Dr. Cotton concerning cases from Delaware and Maryland and an article by Eric Lander. Defendant was also able to bring out on cross-examination of Dr. Adams that the expert was not present through all phases of the procedure performed at the FBI and that the FBI's procedure had never been subject to proficiency test by any outside agency.

We find it significant that there was no contrary expert evidence offered by defendant in order to impeach the testimony of the State's witnesses concerning the reliability of the DNA testing procedure, its acceptance in the forensic community, or the accuracy of the results obtained by Cellmark or the FBI in the instant case. We find that the procedures utilized by Cellmark or the FBI were not shown to have given unreliable results in the instant case, such that the trial court should have excluded this evidence, and we find that the issue of the reliability of these procedures was properly presented to the jury. We therefore hold that the trial court did not abuse its discretion in allowing expert testimony concerning a match between the DNA banding patterns produced from defendant's blood and the semen stain found on the victim's panties. In so ruling, we need not consider whether admission of this evidence was harmless error.

The next issues on review which we will consider involve whether defendant was deprived of his constitutional right to the effective assistance of counsel such that defendant's conviction must be vacated and the cause remanded for a new trial. Defendant contends that his trial counsel was ineffective by eliciting during cross-examination of the State's expert witnesses statistical evidence of the chances of a match occurring between the DNA found in the victim's panties and defendant's blood sample. Defendant urges that his trial counsel's actions cannot be deemed legitimate trial strategy because there is no way that the information brought out concerning the statistical significance of the match could have helped defendant's case. Defendant also maintains that his trial counsel was ineffective because he failed to call defense expert witnesses to challenge the reliability of DNA identification and the statistical probability of another individual having the defendant's DNA pattern, substantially prejudicing defendant's case.

It is well established what a criminal defendant must show in order to establish that he received ineffective assistance of counsel. A defendant must demonstrate both that his counsel's performance was deficient, that is, that his counsel's performance fell below an objec-

tive standard of reasonableness, and also that his counsel's deficiency prejudiced him, that is, that but for counsel's deficiency the result of the proceeding would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 688, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068; *People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246, 1255.) The Supreme Court emphasized in *Strickland*:

> "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064.)

The Court directed that "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." (*Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) If the reviewing court can dispose of the ineffectiveness claim on the basis of lack of prejudice, however, it may do so without determining whether counsel's performance was deficient. *Albanese*, 104 Ill. 2d at 527, 473 N.E.2d at 1256.

As defendant points out, Ms. Light testified on cross-examination that she performed some statistical analyses as a result of the finding of a match between the DNA banding patterns for the semen stain and defendant's blood, from which she concluded that the frequency in the Caucasian population of these same banding patterns was 1 in 12,000. In addition, Dr. Adams from the FBI testified on cross-examination that he performed a statistical analysis to determine the significance of the matches he found, from which he concluded that the likelihood of finding another unrelated individual chosen at random from the Caucasian population with the same DNA profile as defendant's was 1 in 1.7 million. Moreover, as defendant notes, Dr. Adams testified that because the population data base used was not broken down by gender and because only males can produce sperm, the probability of finding another male in the Caucasian population with defendant's DNA profile would increase algebraically by a factor of two.

Defendant further notes that these statistics were drawn from relatively small data bases, 160 to 250 Caucasians for the Cellmark data base and 300 Caucasians for the FBI data base. Defendant states that calculation of the above probabilities using the "product rule," whereby the frequency of occurrence of various bands at various loci are multiplied to produce some large figure representing a small probability of a random match, creates a danger of producing inaccurate and misleading information, citing *People v. Collins* (1968), 68 Cal. 2d

319, 438 P.2d 33, 66 Cal. Rptr. 497, *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734, and *State v. Pennell* (Del. Super. Ct. 1989), 584 A.2d 513. Defendant questions whether the population frequency developed for Caucasians involved in paternity testing or Caucasians accepted into the FBI holds true for Caucasian males living in Litchfield, Illinois. Defendant urges that the statistical evidence, that the chances of a match occurring in the instant case were either 1 in 12,000 or 1 in 1.7 million, was so overwhelming as to deprive the jury of its function of fairly appraising all of the evidence. Defendant also contends that because defense counsel did not question the validity of those statistics with evidence or witnesses of his own, the jury had no choice but to convict defendant after defense counsel's cross-examination of the State's expert witnesses.

■ We have reviewed the above cases cited by defendant and find them either to be inapplicable on their facts to the instant case or contrary to the holding of decisions from the State of Illinois. *Lipscomb* established that each step of the six-step RFLP analysis procedure, including the development of frequencies, and the procedure whereby the individual frequencies are multiplied together to determine the ultimate frequency of the pattern are generally accepted within the particular scientific fields involved and is admissible. (*Lipscomb*, 215 Ill. App. 3d at 432, 574 N.E.2d at 1357.) Moreover, we note that the Illinois decision cited by defendant, *Harbold*, was cited by the defendant on appeal in the *Lipscomb* case for the proposition that the court erred in allowing experts to testify to the statistical probability that a match of all five bands in the black population was 1 in 6.8 billion.

In *Harbold* the State's expert testified that the chances of selecting any two people at random from the population and having them accidentally have identical blood types in each of the specified factors present in that case was less than 1 in 500. The court observed:

"Absent a sound basis to limit the number of possible defendants, the defendant here is but one of thousands of people who share these same characteristics." (*Harbold*, 124 Ill. App. 3d at 383, 464 N.E.2d at 749.)

It further observed that the testimony to statistical probabilities encouraged the jury to disregard evidential risks traditionally weighed in determining guilt or innocence and focused unfairly upon a numerical conclusion. (*Harbold*, 124 Ill. App. 3d at 383, 464 N.E.2d at 749.) Because the court found the case to be factually close and based on circumstantial evidence, the court found that the evidence affected the jury's deliberation. (*Harbold*, 124 Ill. App. 3d at 383, 464 N.E.2d

at 749-50.) The reviewing court further found in *Harbold* that this testimony was irrelevant, beyond the proper scope of expert opinion, and highly prejudicial to the defendant, and the court held that admission of this testimony was plain error.

The *Harbold* decision was distinguished by the court in *Lipscomb*:

"A major concern of the *Harbold* court was that the 1-in-500 statistic did not limit the number of possible defendants. *** However, in the present case that is not a problem. According to the present statistic, it is remote that even one other person in the entire world would match all five bands. The likelihood of several others is infinitesimal. The degree of identification is greatly enhanced. This is why the trial court observed this testimony is much like conventional fingerprint analysis, which works to positively identify the culprit. Accordingly, *Harbold*'s reservations are inapplicable." (*Lipscomb*, 215 Ill. App. 3d at 436, 574 N.E.2d at 1359-60.)

We similarly find the *Harbold* decision inapplicable to our consideration of whether the testimony elicited by defense counsel on cross-examination as to the statistical probabilities of the same match occurring in the Caucasian population created a danger of producing inaccurate and misleading information or was so overwhelming as to deprive the jury of its function of fairly apprising all of the evidence. As the court also noted in *Lipscomb*, the statistical analysis is admissible as relevant to identification, and any challenge to its reliability goes only to the weight to be given by the jury to the evidence. *Lipscomb*, 215 Ill. App. 3d at 436, 574 N.E.2d at 1359.

At closing argument, defense counsel argued that DNA analysis was not an exact science and was a very complex procedure in which any deviation could affect a correct result. Moreover, counsel argued that the area of statistical analysis could be flawed because the scientists took samples from people of a particular race located in one geographic section and projected them worldwide for that race, rather than taking representative samples from around the world. Counsel also noted that the Caucasian population of the United States was approximately 125 million, and so a 1.7 million-to-1 probability would entail a large number of people who would fit the banding pattern in the instant case. Finally, counsel argued that Litchfield, Illinois, was predominately Caucasian and so there was a great possibility that the banding patterns of other people in that area were similar to the defendant's banding patterns.

We find that defense counsel's closing argument did challenge the reliability of the statistical analyses calculated by the State's witnesses as well as the DNA identification process itself. Clearly, counsel's de-

fense theory was that the only evidence connecting defendant with the crime was the DNA evidence and the results of the DNA testing were fraught with error. Moreover, we note that without the statistical evidence the jury's consideration of the results found by the two laboratories would have been a matter of speculation. (*State v. Brown* (Iowa 1991), 470 N.W.2d 30, 33.) Indeed, both Ms. Light and Dr. Conneally testified that development of the statistical analysis is an integral part of the DNA identification procedure, enabling proper interpretation of the DNA evidence. We therefore cannot say that defendant was prejudiced by introduction of the testimony on cross-examination concerning the statistical analyses calculated by Cellmark and the FBI, and we hold that defendant was not denied effective assistance of counsel in this regard.

With regard to defendant's claim that counsel was ineffective because he did not present an expert witness to challenge the testimony of the State's witnesses, we note that this same argument was unsuccessfully made by the defendant in *People v. Miles*. The reviewing court in *Miles* rejected defendant's contention that his trial counsel's representation "fell below an objective standard of reasonableness," as required by the standard established in *Strickland*, noting that counsel made proper, timely objections throughout the trial and vigorously cross-examined the State's expert witnesses. Moreover, the court noted that defendant could not show prejudice, "that the result of the proceeding would have been different," due to the overwhelming evidence of defendant's guilt. In *Miles*, not only did the State present DNA evidence linking defendant with the sexual assault of the victim, but the State also presented evidence of defendant's fingerprints on a telephone, a storm window, the inside of the porch window, and a soda bottle located in the victim's home. In addition, the defendant's credibility was impugned when he testified on his own behalf that he had denied to an investigator that he had been in the victim's home.

■ We cannot say in the instant case that except for the testimony concerning the DNA testing, the evidence of defendant's guilt was overwhelming. There was some independent circumstantial evidence linking defendant with crime, *i.e.*, the victim's sighting of defendant close to her house before she left to pick up Amber, the perpetrator's knowledge of the husband's name and the fact that the husband had been in prison, and defendant's probable knowledge as a neighbor that the husband's car was not home and that husband often worked evening or midnight shifts. Nonetheless, we agree with defendant that the key to the State's case against him was the DNA evidence.

We cannot agree, however, that failure to present an expert for the defense to refute the testimony of the State's witnesses fell below an objective standard of reasonableness. As noted above, defense counsel argued against the reliability of the DNA evidence and the statistical analyses in his closing argument. Moreover, counsel cross-examined the State's experts concerning the reliability of the procedures utilized by the laboratories, the probability of DNA degradation caused by bacteria, and questions concerning the samples developed for the Caucasian population by the individual labs. While the testimony of an expert may have been more effective than counsel's cross-examination and closing argument in which he drew conclusions as to the reliability of DNA testing, we cannot say that failure to produce such an expert fell below an objective standard of reasonableness, considering all the circumstances, or so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. The Supreme Court also observed in *Strickland*:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all to easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.)

We do not believe that defendant overcame the presumption that his counsel's decision to challenge the State's DNA evidence on cross-examination and through closing argument, rather than to present expert testimony refuting the State's DNA evidence, fell within the wide range of reasonable professional conduct. We therefore hold that defendant was not deprived of his constitutional right to the effective assistance of

counsel by his counsel's failure to call defense expert witnesses to challenge the reliability of DNA identification and the statistical probability of another individual having the defendant's DNA pattern.

Finally, we will consider whether defendant was denied a fair trial by the denial of his motion for mistrial made during *voir dire*. The record indicates that, at the start of *voir dire*, juror number 4 stated that she had worked in the county's probation office for nine years before she left that employment in May 1990. The court later asked the *voir dire* panel if they had any family members or friends who had special training or experience in the field of law enforcement, and juror number 4 stated that she had a nephew who is the assistant commander of the Springfield police force. The court asked the prospective juror if she would feel obligated to justify or explain the verdict in this case to the nephew after the case was over, and she said "No." Juror number 4 also stated that her first cousin was currently a probation officer for Montgomery County. The court asked the prospective juror if there was anything about that fact that would make it difficult or impossible for her to be as fair to the defense or the State in this case. Juror number 4 replied:

> "No, but I just feel in the past we have worked with this defendant, within our office, have had files on him on hand and so forth."

The court then asked the prospective juror if that acquaintanceship with the defendant would make it difficult or impossible for her to be as fair to him as to the State, and she said, "No." The court followed up with statements that the prospective juror should understand that any such matters had absolutely no relationship to the substantive issues in the case and that she must disregard that acquaintanceship in deciding the issues in the case based only upon the evidence produced in open court and the law given to the jury by the court.

Counsel for defendant moved for a mistrial based on the statement made by juror number 4 concerning files on defendant in the probation office, arguing that such statement gave a strong inference that defendant has a past record, that this inference was disseminated to the other jurors during *voir dire*, and accordingly, that the jury panel was tainted. The court denied defendant's motion for mistrial, finding that nothing in juror number 4's statement disclosed that defendant had a prior criminal record. It noted that there could be a number of innocent reasons for a probation officer to have a file on someone who did not have a criminal record, *i.e.*, there may have been an investigation by the probation officer when the person was a juvenile, there may have been a file on defendant for pretrial release in a case in which there had been no

conviction, or the probation office may have been involved at the direction of the court with regard to investigating a family matter unrelated to any criminal proceedings.

Defendant urges that this case is factually similar to *People v. Hendon* (1975), 33 Ill. App. 3d 745, 338 N.E.2d 472, in which in response to questioning by the court a prospective juror stated that rape cases were hard to prove and therefore no one would complain of rape unless it were true. The trial court summarily dismissed the prospective juror upon making of this statement, and the remaining panel members were questioned by the court as to whether they were in the same frame of mind as the person who had made the statement. Moreover, the panel was instructed to disregard the statement, and defense counsel was given an opportunity to question the jurors already selected to serve. Unlike the steps taken by the court in *Hendon*, defendant argues, the trial court in the instant case took no steps to protect defendant's right to a fair trial, and some of the jurors who ultimately decided defendant's case were allowed to be seated with the impression that defendant had been involved in prior criminal activity. Defendant urges that he was denied a fair trial and so his conviction must be reversed and cause remanded for a new trial.

We note that following denial of his motion for mistrial defendant sought to excuse juror number 4 for cause, but prior to ruling on this request, the court further questioned the prospective juror in chambers as to her knowledge of defendant's prior felony convictions for burglary in the county. Juror number 4 recalled that the probation office had done a presentence investigation on defendant in connection with a felony or possibly a juvenile offense. The court admonished the prospective juror that if she was selected as a juror she must disregard any information that she had concerning defendant from her employment in the probation office and that she must never disclose to any other member of the jury any information she received while working in that office.

■ While the information stated by the prospective juror in chambers may well have given the *voir dire* panel the impression that defendant had a prior felony conviction, we agree with the trial court that the actual statement made by juror number 4 in front of the panel did not. We also disagree that the trial court failed to take any steps to protect the defendant's right to a fair trial as the court did in the *Hendon* case. The court admonished the prospective juror that her prior acquaintanceship with the defendant had absolutely no relationship to the matters to be decided in the case and that she must disregard that acquaintanceship in deciding the issues in the case. Moreover, when defendant asked the court to excuse juror number 4 for cause, the court

called the prospective juror into chambers for further questioning outside of the presence of the *voir dire* panel.

We note that the court denied defendant's motion to challenge juror number 4 for cause and that the defendant exercised a peremptory challenge to excuse this prospective juror. Of the venirepersons who had heard the comment made by juror number 4 during *voir dire*, we note that only one, Dorothy Millburg, served on the jury. Defendant accepted Millburg without objection on the second panel tendered, and defendant notes that Millburg was accepted at a time when defendant had peremptory challenges remaining.

We find that the circumstances in this case are similar to those in *People v. Townes* (1985), 130 Ill. App. 3d 844, 474 N.E.2d 1334. In *Townes* one of the venirepersons revealed during *voir dire* that defendant had previously been convicted of rape. The court dismissed the venireperson for cause but refused to dismiss the other members of the panel. The defense exercised peremptory challenges to excuse two of these panel members but left one of them on the panel. Defendant contended in *Townes* that he had been deprived of a fair trial by the impaneling of this venireperson, but the reviewing court rejected that argument, noting that failure to exhaust all peremptory challenges precluded the defendant from asserting prejudice as to this venireperson's presence on the jury. *Townes*, 130 Ill. App. 3d at 856, 474 N.E.2d at 1343.

Defendant has the burden of showing that a juror is prejudiced. (*Townes*, 130 Ill. App. 3d at 857, 474 N.E.2d at 1343.) Defendant is precluded from asserting prejudice as to the prospective juror from the *voir dire* panel who had heard the statement defendant alleges tainted the jury, because defendant had not exhausted his peremptory challenges when he accepted this venireperson. Accordingly, we hold that defendant was not denied a fair trial by the denial of his motion for mistrial.

For all of the above reasons, we grant the State's motion to strike portions of defendant's brief, and we affirm the circuit court of Montgomery County's judgment as to defendant's conviction of aggravated criminal sexual assault and the sentence entered on October 5, 1990.

Motion to strike granted; judgment affirmed.

W.A. LEWIS and MAAG,[3] JJ., concur.

---

[3]Justice Maag was assigned to the panel after Justice Harrison's election to the supreme court.